UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 2025-cr-60039

UNITED STATES OF AMERICA

v.

CARLEEN NOREUS

Defendant.
_____________________________________________/

# OBJECTIONS TO CARLEEN NOREUS' INITIAL PSI

FELDMAN FIRM PLLC
2 S. Biscayne Blvd.
Suite 2530
Miami, Florida 33131
Direct: 305.779.5950
Email: afeldman@feldmanpllc.com
Florida Bar No. 60325
Florida Bar No. 1060533
*Attorneys for Defendant*

Ms. Noreus files these objections to the initial presentence investigation report and reserves the right to amend or supplement these objections upon a showing of good cause prior to or at the time of sentencing. Fed. R. Crim P. 32(i)(1)(D); Fed. R. Crim. P. 32(f)(1)

## I. Legal Objections to the Calculation of the Guidelines

### A. Intended Loss of More than 26M

Mrs. Noreus objects to the application of a 26 million dollar intended loss. Earlier this week, Mrs. Noreus asked the government to identify its methodology for arriving at 26M. The government has not responded, and Mrs. Noreus should not be forced to guess how the government reached this number. And so, until Mrs. Noreus is placed on notice of the methodology used to calculate the 26M loss figure, Mrs. Noreus cannot meaningfully respond and reserves the right to provide the court with both factual argument and legal argument once that information is readily available to counsel.

A few notes about the intended loss here.

First, and importantly, the government has applied gain by multiplying (# of transcripts x tuition amounts) in every nursing case. They have used gain as a proxy because they cannot calculate actual

loss in any one of these nursing cases. [1] Here, the amount of gain at trial was approximately 9.5 million. But now has vaulted another 15M to 26M.

Second, it appears the government chose intended loss here to punish Mrs. Noreus as much as possible and vault Carleen's Guidelines as close as possible to the statutory maximum of 20 years for exercising her 6th amendment right to a trial and making the government prepare for a trial, but which ended in Mrs. Noreus' acceptance of responsibility for her crimes. If that were not the case, then the government would have applied intended loss to every other nurse in every other case in this District. They did not. Carleen stands alone.

**B. Aggravated Role Adjustment**

¶40. An aggravated role enhancement is not warranted in this case. Adjustment for role requires organizing or leading a criminal activity that involved five or more participants, and that threshold is not met here. *United States v. Armas*, 712 Fed.Appx.923 (11th Cir. Oct. 24, 2017)

---

[1] The government can calculate some of the actual loss here – it is the amounts paid by the 5 employers to the 5 nurses that never testified at trial which amounts to more than $150,000 but less than $250,000.

(clear error when the District Court applied a role enhancement without finding there was at least one other criminal participant in the defendant's scheme and under his control); *United States v. Campa,* 529 F.3d 980 (11th Cir. 2008) (finding that enhancement is unwarranted in the absence of a finding that the defendant asserted control or influence over at least one other participant in the crime); *United States. v. Baggett,* 954 F.2d 674 (11th Cir. 1992) (vacating 4 level enhancement, since there was no evidence in the record to prove that defendant was involved with five or more participants); *United States v. Martinez*, 584 F.3d 1022 (11th Cir. 2009) (requiring evidence that the defendant exerted some control, influence, or decision-making authority over another participant in the criminal activity).

The government called two former employees of Carleen Health Institute, Dr. Patricia Nabal and Barbara Lewis. The testimony of each employee belies the assertion that an adjustment is appropriate. Neither witness testified that Carleen (or anyone else) supervised, managed, or directed *their* criminal activity. And neither witness testified that they were aware of or agreed to engage in any unlawful conduct.

First, Dr. Nabal never testified that she participated in the conspiracy. Instead, Dr. Nabal testified that her role at the school was teaching and serving as the program director. Trial Tr. 15:2-4; 16:21-22 (June 3, 2026). Dr. Nabal also resigned from her position the same month the conspiracy began. Dr. Nabal never testified that she issued diplomas or that Mrs. Noreus directed her to engage in any unlawful conduct or the making of any fake diplomas. *Id.* at 36:13-17.

Second, Barbara Lewis, a former employee of Carleen Health Institute, testified that she never did anything wrong and never agreed to violate the law with Carleen. Trial Tr. 117:3-5 (June 4th, 2026). Mrs. Lewis also testified that she did not approve the issuance of transcripts to students, *id.* at 80:2-6, and JT controlled the student files. *Id.* at 75:22-25. In fact, Mrs. Lewis testified that she would reject certain transcripts:

> A. Right. I personally would reject that transcript.
> Q. Because you rejected that transcript, it's your testimony that those transcripts that you reject were never used; right?
> A. Well, I don't know if some of them were used, but I reject them. I don't have the last word.

*Id.* at 119:15-19. This is entirely inconsistent with controlling or supervising a person's criminal activity.

And lastly, Ms. Lewis testified that Ms. Noreus responded to inquiries from state boards of nursing, not Mrs. Lewis. *Id.* at 93:5-19.

Beyond this, the students the government called do not support an adjustment for role. Yaminy Torres was a student at Carleen Health Institute and testified that she never did anything wrong. *Id.* at 39:22-24. Ms. Torres testified that she completed 8 sessions of NCLEX review during which classes consist of exam prep and instruction on specific courses. *Id.* at 46:5-15.

The other student, Lydea Ouiya, never met Carleen or interacted with Carleen. She was recruited by Stanton Witherspoon and paid Stanton $16,000 for a transcript.

In sum, the government adduced evidence that Carleen perpetrated the fraud on her own and that she controlled the banking associated with the fraud, no one else. Yet they failed to introduce any evidence that Carleen was directing, supervising, or managing the criminal conduct of any other person – certainly not Barbara or Dr. Nabal – let alone controlling or influencing that criminal conduct.

**C. Risk of Bodily Harm Adjustment**

¶49. A two-point enhancement for conscious or reckless risk of death or serious bodily injury is not warranted here. Mrs. Noreus played no role in the unfortunate death of the patient. In fact, Tahira herself disputes the cause of death and denies that she was liable for the death or the circumstances leading to the patient's death.

Where the Eleventh Circuit has found there to reckless risk of death or serious bodily harm there was much more connection between the people at risk and the defendant. *United States v. Moran*, 778 F.3d 942, 978 (11th Cir. 2015) (Court found the defendants placed the Medicare beneficiaries at risk of death or serious bodily injury when they admitted elderly patients with dementia, although the facility and staff were not equipped to meet the elderly patients' needs. Additionally, the elderly patients where placed among chronic substance abusers who also weren't being treated properly); *United States v. Achille*, 277 Fed.Appx. 875 (11th Cir. May 12, 2008) (Court upheld an enhancement for risk of death or serious bodily injury where patients were receiving drug injections that

carried serious side effects and the injections were medically unnecessary).

There is no evidence that Mrs. Noreus knew that Mrs. Bastien had not received the proper clinical training to treat patients. Instead, what Carleen did was backdate her transcript and transfer all Tahira's Sigma credits onto that same transcript to give the false appearance that Tahira had completed those courses at CHI on dates when CHI was eligible to enroll students in the ASN program – which it was not. This is, however, not a situation like, for example, government witness Lydea Ouiya who paid Stanton Witherspoon for transcripts and completed no clinicals or coursework but then decided it was acceptable to treat patients. Tahira was a far cry from Lydea Ouiya.

Mrs. Bastien was trained at Sigma Health nursing institute and maintained to the government that she completed each of her courses there, including clinicals. Mrs. Bastien was placed by Triage at Banner and then Mercy. At Banner, she received additional training. And then, supervisors complained about her demeanor and her competence, and she was terminated from that assignment but then Triage reassigned

Tahira to treat patients at Mercy. At Mercy she received additional training. And, very sadly, the patient died.

**D. Sophisicated Money Laundering**

¶51. Ms. Noreus objects to the inclusion of a sophisticated money laundering two-point enhancement.

Under Section 2S1.1(b)(3) a two-point increase can be applied if the offense involved "sophisticated laundering". Commentary to the Guidelines highlighted the type of conduct that typically qualifies as the use of fictious entities, shell corporations or offshore financial accounts. U.S.S.G. §2S1.1(b)(3). The Eleventh Circuit has held that the enhancement is aimed at more elaborate laundering conduct with a focus on how it is carried out or how it is masked. *United States v. Morilla*, 177 F.4th 1291, 1297 (11th Cir. 2026) (The Court held a sophisticated laundering enhancement couldn't be upheld where the laundering activity consisted of one layer

Here, the government showed no evidence of any shell corporation, fictious entity, or offshore account. Instead, the government's forensic accountant testified that each of the accounts she analyzed were under

the name Carleen Noreus or CHI, where Carleen was the only owner and president. Trial Tr. 141-142:21-25,1-2; Tr. 144:14-17; Trial Tr. 147:13-15 (June 4, 2026). There was no elaborate concealment or complicated execution. In fact, the laundering involved simple transfers of money from accounts owned by Carleen into other accounts owned by Carleen.

In addition, it is important to note that the laundering conspiracy to which Carleen pled guilty related to discrete acts of concealing the proceeds of tuition payments made by students of VA to CHI. Carleen received those tuition payments under the false premise that CIE had not terminated its eligibility to enroll students. Dkt. No. 123. Again, this is not sophisticated concealment and does not involve anything more than movement between same name accounts.

Thus, the sophisticated money laundering enhancement is not supported by any evidence and should not be included.

## II. Clarifications of Objections to Other Portions of the Presentence Investigation Report

¶34. Mrs. Noreus requests clarification of this assertion. Mrs. Noreus objects to the assertion that she gained $5,000 per student. That is contrary to the evidence at trial.

¶35. Mrs. Noreus admits that she received hundreds of thousands of dollars in cash but objects to the assertion that she received $1 million in cash.

¶69. Marcia Derby is not retired and living in Sunrise. She is employed as an educator and lives in West Palm Beach. Karen Thompson is not an insurance agent. She is a case manager for an insurance company.

¶79. On August 14, 2026, Ms. Noreus voluntarily relinquished her nursing license that she held in Florida.

¶88. The asset number reflected in this paragraph does not include the cashier's checks information provided to Office of Probation in the financial declaration form. The total cashier's checks amount to $4,189,732.71. Mrs. Noreus is ready to endorse each of those checks to the USMS today.

Respectfully submitted,

*/s/Kyra. G Harkins*______
FELDMAN FIRM PLLC
2 S. Biscayne Blvd.
Suite 2530
Miami, Florida 33131
Direct: 305.779.5952
Florida Bar No.: 1060533
Email: kharkins@feldmanpllc.com
*Attorney for Defendant*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing was filed this day via CM/ECF and served on all counsel of record appearing on CM/ECF.

*/s/Kyra. G Harkins*______