**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 25-60039-CR-SINGHAL(s)(s)**

**UNITED STATES OF AMERICA**

**v.**

**CARLEEN NOREUS,**

**Defendant.**
_____________________________________/

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT**

The United States, by and through the undersigned Assistant United States Attorney, hereby files its response in opposition to the objections to the Pre-Sentence Investigation Report ("PSI") filed by defendant Carleen Noreus (ECF 145). In support of its response, the United States avers as follows:

**Factual and Procedural History**

This case involves defendant's operation of two corrupt nursing programs; Carleen Home Health School Inc. and Carleen Home Health School II Inc., located in Broward and Palm Beach Counties that were owned and operated by Carleen Noreus. The respective Carleen schools were approved by the Florida Commission for Independent Education (CIE) and the Florida Board of Nursing to offer a Bachelor of Science in Nursing program and Associate of Science in Nursing (ASN) program on-site at the campuses located in South Florida.

Co-conspirator Stanton Witherspoon pleaded guilty to wire fraud conspiracy charges in Case No. 23-60005-Cr-Smith and cooperated with the Government. Witherspoon initially met Noreus around 2018, along with Lemuel Pierre and Cleophat Tanis (the owners of Medlife Institute, another fraudulent nursing school chain) to discuss the purchase of one of the Carleen School locations. Although the purchase was never completed by Medlife, Noreus agreed to willingly issue fraudulent diplomas and transcripts to the Medlife student applicants. The cost was initially $5,000 to $6,000 per student, and as the volume increased, the price rose to $12,000 to $16,000. None of the student applicants Noreus processed from Medlife took the classes and clinicals as reflected on their transcripts.

Later, in approximately late 2018 or early 2019, Witherspoon left Medlife but continued recruiting nursing students to be processed through the Carleen Schools to receive diplomas and transcripts without completing the necessary courses or clinicals. Typically the students never attended the Carleen Schools at all; they simply paid for the diplomas and transcripts and received them within a few weeks of paying. Witherspoon would email, text, or upload the student applicant information into a Dropbox account and Noreus used that information to create the Carleen School diplomas and transcripts. Witherspoon then paid Noreus in exchange for the student transcripts.

In October 2020, Witherspoon purchased the Carleen West Palm Beach location. However, after the purchase, Noreus continued to be involved in the fraudulent business because the transfer of ownership was denied by the CIE. Consequently, Noreus continued to sign the fraudulent diplomas and transcripts for Witherspoon's students.

Meanwhile, Noreus continued to recruit and issue diplomas and transcripts for her own students at the Plantation facility while still issuing fraudulent Carleen West Palm Beach diplomas and transcripts. All of the Plantation school's nursing programs had been terminated by May of 2020, so Noreus started offering what she called an 80% review program whereby students would enroll and attend three weekend sessions (six days of nursing review training). Upon the completion of this board review program (and final payment) Noreus provided students a Carleen School diploma and transcript that was backdated to reflect earlier dates of attendance while the the Plantation facility was authorized to issue diplomas. In the alternative, Noreus would issue the documents under the name of the West Pam Beach campus while that program was still authorized to confer nursing degrees.

Noreus in turn submitted the fraudulent Carleen School transcripts to various boards of nursing throughout the county so the students could take the board exam and obtain a nursing license. Many of the students needed to take the test many times before passing. Noreus and co-conspirator Jessica Thompson (identified as co-conspirator 2 in the Second Superseding Indictment) verified the educational histories of the nurse applicants when called upon by prospective employers.

At trial, Witherspoon and other witnesses testified that Noreus issued fraudulent Carleen School diplomas and transcripts and submitted the documents to state Boards of Nursing and employers. Various records (including text messages, emails, and other paper documents) substantiated that Carleen Noreus knowingly and intentionally participated in a scheme to create the fraudulent transcripts in return for payment.

On June 15, 2026, after two weeks of trial testimony, defendant pleaded guilty to Counts One and Seven of a 10-count Second Superseding Indictment. Count One charged conspiracy to commit wire fraud, in violation of 18 U.S.C. §1349. Count Seven charged conspiracy to commit money laundering, in violation of 18 U.S.C. §1956(h).

The United States Probation Office prepared a Presentence Investigation Report ("PSI") in this case. For a violation of 18 U.S.C. §1956(h), the PSI applied the guideline for the underlying offense, that is wire fraud, found at USSG §2B1.1(a)(1) (PSI at ¶ 49). That section provides if the defendant was convicted of an offense that has a statutory maximum of 20 years of more, the base offense level is seven (id.). The PSI recommended that Noreus be held accountable for an intended loss of $26,000,000 (id.). Because the loss is more than $25,000,000 but less than $65,000,000, the offense level is increased by 22 levels pursuant to §2B1.1(b)(1)(L) (id.). Because the offense involved the conscious or reckless risk of death or serious bodily injury, the offense level is increased by two levels, §2B1.1(b)(16)(A) (id.). As a result, the total base offense level is 31 (id.).

In addition, because the offense of conviction is a violation of 18 U.S.C. §1956, the offense level is increased by an additional two levels pursuant to §2S1.1(b)(2)(B) (id. at ¶ 50). Because subsection (b)(2)(B) applies and the offense involved sophisticated laundering, the offense level is increased by two levels, §2S1.1(b)(3) (id. at ¶ 51). Because defendant is considered a manager or supervisor and the criminal activity involved five or more participants or was otherwise extensive, the offense level is increased by four levels, §3B1.1(a) (id. at ¶ 53).

Defendant was awarded a three-level reduction for acceptance of responsibility for the offense pursuant to §§3E1.1(a) and (b) (id. at ¶¶ 57, 58). Because defendant had no prior criminal

history, her criminal history category is I (id. at ¶ 62). A criminal history category of I with an offense level of 36 yields an advisory guidelines range of 188 to 235 months (id. at ¶ 101).

## ARGUMENT AND MEMORANDUM OF LAW

*1. The PSI report properly established the offense level loss.*

Defendant first objects to paragraph 31 of the PSI wherein the Probation Department assessed an offense level loss of $26 million.

Under §2B1.1 of the Guidelines Manual, the Court is instructed to apply a 22-level enhancement when an offense involving fraud or deceit results in loss over $25 million but less than $65 million. USSG §2B1.1(b)(1)(L). The loss amount "is the greater of the actual loss or intended loss." USSG §2B1.1, cmt. n.3(A). Actual loss is the reasonably foreseeable pecuniary harm that results from the crime. *Id*. at §2B1.1, cmt. n.3(A)(i). Intended loss is the pecuniary harm that the defendant purposefully sought to inflict, even if it would have been impossible or unlikely to occur. *Id*. at § 2B1.1, cmt. n.3(A)(ii).

The $26 million figure is based on sworn testimony and evidence admitted at trial and serves as a sound basis for this Court to arrive at an appropriate offense loss level. The loss level was determined in the same manner as has been employed in the roughly 45 cases that have emanated from the Operation Nightingale nursing school diploma fraud initiative, that is, the cost of the diplomas that the students paid Noreus and Witherspoon.

Evidence at trial established that from April 2018 through October 2025 Noreus issued at least 2,956 fraudulent transcripts based upon the number of students who sat for the NCLEX boards exam who applied under the two Carleen Health Institute campuses. *See* Government's

Exhibit 51. Among those roughly 3000 students, Noreus issued approximately 1000 fraudulent transcripts and diplomas for students at the West Palm Beach campus. The WPB students paid approximately $16,000 per diploma/transcript for a total of $16 million intended loss. *See Testimony of Stanton Witherspoon, (Day 5)* at 128; *Testimony of Lydia Wright Ouiya, id.* at 57-58. At least 1,747 students attended the Plantation campus. Government Exhibit 55R. Among the Plantation students, approximately 1,073 students attended the "80 % review" course and another 472 students enrolled in self-study. who each paid Noreus approximately $3000 tuition for an ASN degree. *See Testimony of Yanimy Torres (Day 4)*, at 36; Government's Exhibit 55R. Financial records at trial confirmed that Noreus received approximately $10 million during the period of the conspiracy, the majority of which consisted of Pay Pal and cash payments. *See* Government's Exhibit 100, pp. 3, 12, and 23.

The $26 million loss figure thus serves as an appropriate measure of the financial loss attributable to defendant and her co-conspirators in this case. Generally, "loss is the value of the money, property, or services unlawfully taken." USSG §2F1.1 comment. (n.8). Fraud is conjured in numerous variations and that should be considered when choosing a calculation methodology for the harm intended or caused. *See United States v. Orton*, 73 F.3d 331, 333 (11th Cir.1996). Furthermore, because loss is often not calculable "with precision," the Court need only "make a reasonable estimate of the loss, given the available information." USSG §2B1.1 comment. (n.3(c)); *Orton*, 73 F.3d at 335 (citation and emphasis omitted). Here, there is adequate support in the record to substantiate the 22-level increase for loss attributable to Noreus and her objection in this respect should be overruled.

*2. Defendant's conduct warrants an aggravated role adjustment.*

Defendant argues that she should not receive a four-level increase under §3B1.1(a) based on the finding that she was an organizer or leader of extensive criminal activity. Her position should be rejected.

Section 3B1.1(a) of the guidelines provides for a four-level increase if the defendant was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." USSG §3B1.1(a). The defendant must have been the organizer or leader of at least one participant. §3B1.1 cmt. n.2. A participant is defined as "a person who is criminally responsible for the commission of the offense," but the person "need not have been convicted." §3B1.1 cmt. n.1. Factors to be considered include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning the offense, the nature and scope of illegal activity, and the degree of control and authority exercised over others. §3B1.1 cmt. n.4.

Here, defendant was clearly an organizer or leader of the conspiracy to commit wire fraud that involved more than five participants and was otherwise extensive. Evidence at trial established that Noreus was president and chief administrator of the Carleen Health Institute campuses located in West Palm Beach and Plantation. Noreus hired and supervised numerous employees at the school including Barbara Lewis, Patricia Nabal, Ilfrede Noreus, Norma Thompson, and Jessica Thompson who is identified as co-conspirator 2 in the Second Superseding indictment. Thompson helped create the fake diplomas and transcripts and otherwise acted as Noreus's right hand

according to witnesses. In addition to Thompson, other participants in the offense included Stanton Witherspoon, co-conspirator 1 (Tahira Bastien), and the thousands of nursing students who were complicit in obtaining fraudulent nursing school transcripts and diplomas.

Moreover, this nursing school diploma fraud scheme was extensive. Noreus operated the two Carleen Health campuses from 2018 through 2025. Noreus provided almost three thousand fake transcripts and diplomas to students who sat for the NCLEX exam.

As described above, Noreus enjoyed the greatest share of profit from the fraudulent nursing school diploma scheme earning approximately $10 million during the conspiracy. Noreus exercised decision making authority having obtained approval from the State of Florida for the operation of the nursing school programs and represented Carleen Health Institute at annual Florida Board of Nursing and CIE meetings concerning her operation of the nursing programs.

Plainly Noreus earned the lion's share of the fruits of the crime and participated in every aspect of planning and organizing the execution of the nursing school diploma fraud scheme. It is without cavil that the offense involved five or more participants and given her decision-making authority and pervasive involvement in the conspiracy that lasted many years, defendant clearly warrants application of a four-level upward adjustment for her significant role in the offense.

*3. The offense involved the conscious or reckless risk of death or serious bodily injury.*

Noreus next challenges the two-level increases to her offense level because the offense involved the conscious or reckless risk of death or serious bodily injury. Defendant argues that because she did not directly cause the harm to the patient who died at Mercy Hospital she should not be held liable under this provision. This argument fails.

Under §2B1.1, which applies to fraud offenses, sentencing courts should apply a two-level increase in offense level if the offense involved "the conscious or reckless risk of death or serious bodily injury." USSG §2B1.1(b)(16)(A). Serious bodily injury is defined as injury "involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." USSG §1B1.1, comment. (n.1(L)). Interpreting the enhancement, "[t]he Guidelines ... do not require that the victim actually suffer serious bodily injury. Rather, the question is whether the defendant placed the victim at such a risk." *United States v. Snyder*, 291 F.3d 1291, 1294-95 (11th Cir.2002).

Here, the patient who suffered mistreatment at the hands of co-conspirator 1 (Tahira Bastien) suffered serious bodily injury and death which directly resulted from defendant's conduct. Bastien enrolled in Carleen Health Institute seeking an Associate Degree in Nursing (ADN) degree. Bastien attended a few classes part time and studied for the NCLEX board exam at Carleen Health for approximately two months, took an exit exam, and then received her diploma and transcript which falsely represented that she completed the requirements for graduation from Carleen Health Institute with an ADN degree.

Bastien then sat and eventually passed the NCLEX RN board exam on January 6, 2021. Upon passing the NCLEX RN exam, Bastien applied for employment as a travel nurse through a staffing company. When applying with the staffing agency, Bastien falsely represented that she completed her ADN degree at Carleen Health Institute. The staffing company contacted Jessica Thompson, defendant's daughter, who falsely verified that Bastien had in fact obtained her ADN

at Carleen Health Institute. The ensuing verification provided by Jessica Thompson falsely represented that Bastien attended Carleen Health Institute from August 2018 through December 2020 and completed all the necessary requirements for her ADN degree.

The staffing company relied on this information and hired Bastien as a traveling RN. In May of 2023. Bastien was assigned to work as an RN at Mercy Hospital, a hospital located in St. Louis, Missouri. Bastien was terminated from her RN position due to a "sentinel event", that is, is an unexpected incident that caused death or serious injury. Specifically, on August 2, 2023, Bastien failed to provide proper medical care to one of her assigned patients throughout her shift who had experienced atrial fibrillation or an irregular and often very rapid heart rhythm. Bastien failed to timely notify the attending physician or nurse in charge as was protocol. When ordered to administer an IV, Bastien did not check to see if her IV access was proper and attempted to infuse liquids into a "blown" IV. Two hours later, another emergency alert went off in the patient's room and Bastien failed to respond to calls by the staff. When staff arrived in the room, they observed Bastien attempting to feed the patient who had difficulty breathing and was vomiting. Staff intervened and assessed that the patient had a distended abdomen and was fluid overloaded. The patient's health continued to deteriorate while Bastien failed to respond to calls. Within two hours the patient died and Bastien failed to include notes pertaining to the patient's death in the chart.

Bastien rendered deficient medical attention to several other patients under her care during her employment at Mercy Hospital. Bastien failed to change the hemodialysis catheter of one patient and left the dressing hanging on with the line exposed. In interactions with staff, Bastien expressed that she was unfamiliar with how to use an insulin pen, did not know how to divide a

50 mg tablet by cutting it at the score line to get a 25 mg tablet, and did not know how to use a pill cutter. On another occasion she was unsure of bladder scanning and how to use a foley catheter. When treating a patient, Bastien failed to take vital signs every four hours as was required and provided the patient with plain water despite orders indicating that the patient should receive nectar thick liquids. When confronted with this error, Bastien claimed that she did not understand what nectar thick liquids were and how to use nectar to thicken liquids.

Based on these severe deficiencies, Mercy Hospital cancelled Bastien's employment contract. Another hospital facility located in Phoenix, Arizona, Banner Health, had also terminated Bastien due to patient safety concerns. Bastien confirmed in an interview that she only attended Carleen for approximately two months and subsequently issued a Carleen diploma and transcript.

In challenging the application of this enhancement, defendant maintains that she played no role in the death of the patient but this is patently wrong. Clearly, Bastien used the fraudulent transcript and diploma issued by Noreus to sit for the NCLEX and obtain employment as a travel nurse. Defendant's daughter Jessica Thompson verified Bastien's attendance at Carleen and attested that she had completed the necessary academic and clinical work to earn an RN degree. Obviously, Bastien was ill-prepared to perform as an RN evidenced by the grossly deficient care she rendered at Mercy Hospital and Banner Hospital. But for defendant's diploma fraud scheme, Bastien never would have qualified for an RN position for which she was woefully unprepared.

Importantly, this enhancement is triggered not necessarily by actual harm but from *risk* of serious bodily injury. The guidelines provide for a two-level increase if the offense involved "the conscious or reckless *risk* of death or serious bodily injury." USSG §2B1.1(b)(16)(A) (emphasis

added). Even if there is no evidence of death or serious bodily injury, the two-point increase nevertheless is appropriate, because the enhancement focuses on a defendant's disregard of risk, rather than on the result. *United States v. Mateos*, 623 F.3d 1350, 1371 (11th Cir. 2010).

Here, Noreus who herself earned an RN and a master's degree in nursing was well aware of the risks posed to the patient population because of the inadequate education and training she afforded "graduates" from her ADN programs. As the court recognized in Mateos, "[e]ven though there was no evidence that any patient was actually harmed from the treatments, the enhancement was nevertheless appropriate because the Guidelines provision focuses on the defendant's disregard of risk rather than on the result." *Id*. at 1371 (sentencing court did not err in finding that a trained nurse, such as Mateos (who also received training as a doctor in Cuba), would be well aware that any injection always carries some risk of infection or other complications, and that the risk is especially high when the patients have HIV and weakened immune systems). Clearly defendant's conduct toward Bastien and other students who obtained fake degrees without having completed the requisite education and training placed patients at risk of serious bodily injury. *See United States v. Achille*, 277 F. App'x 875, 877–78 (11th Cir. 2008) (in sentencing defendant for conspiracy to defraud the United States and health care fraud, sentencing court did not err in applying sentencing guidelines offense level enhancement for an offense involving conscious or reckless risk of death or serious bodily injury; one of the nurses at the clinic testified that some patients received drug injections, and expert witness testified that the drugs involved carried the risk of serious side effects, and those side effects qualified as serious bodily injuries).

Thus, the offense of conviction in this case clearly involved the conscious or reckless risk of death or serious bodily injury and a two-level upward adjustment is appropriate.

*4. The offense involved sophisticated laundering pursuant to §2S1.1(b)(3).*

Noreus lastly argues that she does not deserve a two-level sentencing increase under §2S1.1(b)(3) for sophisticated laundering because there is no evidence that her money-laundering scheme was committed in a sophisticated manner.

Section 2S1.1(b)(3) provides a two-level increase if a defendant convicted under 18 U.S.C. §1956 commits an offense that involved "sophisticated laundering." USSG §2S1.1(b)(3). The commentary to the Guidelines explains that "sophisticated laundering" refers to "complex or intricate offense conduct pertaining to the execution or concealment" of the laundering offense. §2S1.1, cmt. n.5(A). And while the commentary does not make any single feature dispositive, it identifies the kinds of conduct that typically qualify: the use of "fictitious entities" or "shell corporations"; "two or more levels (i.e., layering) of transactions" designed to make criminal proceeds appear legitimate; or "offshore financial accounts." *Id*. In other words, the enhancement is aimed at laundering conduct that is materially more elaborate, either in how it is carried out (execution) or in how it is masked (concealment), than routine laundering transactions. *United States v. Morilla*, 177 F.4th 1291, 1297 (11th Cir. 2026)

Here Noreus' money-laundering scheme involved two or more layers of transactions to conceal the source of his illicitly derived funds. Review of financial records shows that Noreus received funds in the form of checks, cash, credit card receipts, and PayPal transfers directly from students seeking to obtain fraudulent nursing diploma and transcripts. Additionally, she received

funds from student recruiters including Stanton Witherspoon. Witherspoon made payments to Noreus in various forms, primarily in cash and by check. As explained by Witherspoon at trial, and corroborated in the financial records, Noreus often requested cash payments to help conceal the source of the funds. Financial summaries showed that Noreus deposited almost $1,000,000 in cash into her personal and corporate accounts during the conspiracy. Additionally, when Witherspoon wrote checks to Noreus to pay for fraudulent documents, he typically put fake information in the memo line of the check to conceal the true purpose of the payments, which was always the purchase of phony nursing school records. Noreus, in turn, deposited these fraud proceeds into various accounts under her control and then proceeded to commingle those funds with proceeds from other sources, then layer those funds through various business and personal accounts.

For example, the TD Bank account number ending 1550 in the name of Carleen Home Health School Inc., DBA CHI Home Health Center, was funded almost entirely from the transfer from account number ending 2847 at TD Bank in the name Carleen Home Health School DBA. Similarly, account number 2847 at TD Bank in the name Carleen Home Health School DBA was funded almost entirely from account number ending 5751 at TD Bank in the name Carleen Ann Noreus. Account number 5751 had a total of $824,410.67 in deposits during the time of the alleged conspiracy, including interest payments. $671,871.89 of the deposits into this account during the same time were deposits of proceeds of the above-described scheme or inter-account transfers from other accounts into which proceeds were deposited.

Plainly the activity described above manifests Noreus' layering of transactions in an effort to make her illicit proceeds appear legitimate. It follows that defendant's conduct was committed in a sophisticated manner warranting the enhancement. *United States v. Suraneni*, 346 F. App'x 416, 418–19 (11th Cir. 2009).

## CONCLUSION

WHEREFORE, based on the foregoing, the United States respectfully requests that the Court deny the objections to the Presentence Investigation Report filed by defendant Carleen Noreus in the instant case.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: /s/Christopher J. Clark
CHRISTOPHER J. CLARK
Assistant United States Attorney
Florida Bar No. 0588040
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9167
christopher.clark@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 11, 2026, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

/s/ Christopher J. Clark
CHRISTOPHER J. CLARK
ASST. UNITED STATES ATTORNEY