UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 25-CR-60039

UNITED STATES OF AMERICA )
)
*Plaintiff* )
)
vs. )
)
CARLEEN NOREUS )
)
)
*Defendants*. )
)

**CARLEEN NOREUS' SENTENCING MEMORANDUM**

FELDMAN FIRM PLLC
2 S. Biscayne Blvd.
Suite 2530
Miami, Florida 33131
Direct: 305.779.5950
Email: afeldman@feldmanpllc.com
Florida Bar No. 60325
Florida Bar No. 1060533
*Attorneys for Defendant*

## INTRODUCTION

Carleen Noreus stands before this Court ready to accept whatever punishment this Court deems appropriate. Carleen has accepted responsibility and is remorseful for her actions. *See* Letter of Ilfride Noreus. ("She is not taking this lightly. She understands the seriousness of what she has done, and she understands that she has disappointed people and caused pain. She carries that responsibility with her[1].") Carleen is a loving wife, mother, grandmother, and sister. She has no criminal history. Carleen knows what she did was wrong and that she will be sentenced to a period of imprisonment. She is ready to serve this time with dignity, self-reflection and positivity. Mrs. Noreus asks this Court that she be sentenced to no more than 60 months of imprisonment.

## ARGUMENT

### A. Carleen Through the Lens of Her Family and Friends (18 U.S.C. Section 3553(a)(1))

Carleen's friends and family describe her as a caring woman, always willing to step in and help those around her. Her husband of 20 years, Ilfride Noreus, describes as his best friend and partner:

> Carleen has been a major part of the life we have built together.. She is not simply someone I live with, she is the person I come home to, the person I have shared my dreams and worries with, and the person who been beside me through so many chapters of my life. [2]

[1] Letter of Ilfride Noreus (p.1)
[2] Letter of Ilfride Noreus (p.1)



*Carleen pictured with her family*



*Carleen with her two daughters*

Carleen's youngest daughter, Kayla Fagan, details the close relationship she has with her mom.

> Even at 27, I rely on her advice for almost everything. Whether the matter is of great consequence or a smaller, everyday decision I should perhaps handle independently, she always offers either an answer or a perspective. As a daughter, I have come to deeply appreciate the wisdom in both.[3]

Kayla also describes how all the support Carleen has given her has helped guide her.

> My mother's support has been immeasurable. She has guided me through difficult times, encouraged me when I needed it most, and celebrated my joys alongside me. Her presence has provided me with a sense of security that I may have taken for granted.[4]

Jessica Thompson, Carleen's eldest daughter, wrote about how much Carleen helped her when her son was born, missing part of his brain and his hand.

> There was a point when I felt like I could not continue. I was in a place where I could no longer see hope for myself. My mother was the person who helped pull me back from that place. I genuinely do not know where I would be today without her. [5]

Carleen cares for her disabled grandson two to three days a week, and her son-in-law Ricardo Reid described the physical care that Carleen provides. ("She performs physical therapy, moving and stretching his limbs to prevent contractures. This is a stiffening caused by lack of movement[6].") Ricardo writes that the connection is deep for his son. ("He can't understand English. But he understands love. For him, she's irreplaceable[7].").

---

[3] Letter of Kayla Fagan (p.1)
[4] Letter of Kayla Fagan (p.1)
[5] Letter of Jessica Thompson (p.2)
[6] Letter of Ricardo Reid (p.1)
[7] Letter of Ricardo Reid (p.1)



*Carleen with her grandson*



*Carleen pictured with her husband, daughters, and grandson*

Carleen goes out of her way to make everyone in her life feel special. She shares a close, friendly relationship with her ex-husband, Alfrado Fagan, and his wife, Suzette Fagan. Both Alfrado and Suzette wrote about the way Carleen has made them and their children feel included as family. ("She has gone out of her way to ensure my wife is included in family gatherings and has been a supportive presence for my other children. She does these things not out of obligation, but because of who she is[8].") Carleen's friend, Dwight Bell, also described how Carleen has made him feel welcome despite not being close to his own family. ("She never made me feel like a outsider. She accepted me, included me, and made me feel like I had a place.[9]")

Carleen cares for people not only emotionally, but physically as well. Suzette Fagan detailed the way Carleen spent time helping her with her Type 1 Diabetes.

> When I was trying to learn how to manage my Type 1 diabetes, she came over and spent time talking with me about monitoring it and making better choices with my diet. I had questions, and she never made me feel uncomfortable asking them. She was patient, caring, and willing to share what she knew. Those moments meant a great deal to me, especially during a time when my health could feel frightening and overwhelming.[10]

Similarly, Carleen assisted Alfrado when he was diagnosed with high blood pressure. (Carleen arrived with a blood pressure monitor, showed me how to use it, and offered guidance on tracking my health. She continued to check on me, ensuring I was managing well.[11]")

Carleen's brother-in-law, Otis Rankine recounted how Carleen helped him after he had emergency gallbladder surgery. ("Carleen didn't wait for me to ask for help. She would

[8] Letter of Aflrado Fagan (p.1)
[9] Letter of Dwight Bell (p.1)
[10] Letter of Suzette Fagan (p.1)
[11] Letter of Alfrado Fagan (p.1)

bring meals over for me that I was able to eat and would check in to make sure I was doing okay[12].")

**B. Sentencing Disparities (18 U.S.C. Section 3553(a)(6))**

When sentencing Mrs. Noreus, the court should consider other sentences imposed in this District to achieve the goal of uniformity in sentencing under Section 3553(a)(6). The Government seeks a sentence for Mrs. Noreus that is 300% higher than Gail Russ. Gail Russ received the highest sentence from any of the nursing school cases (78 months) and did not plea guilty, did not accept responsibility, did not voluntarily contribute millions of dollars towards her forfeiture judgment, and appealed her conviction and sentence. *United States v. Russ*, No. 23-CR-60007-AHS (S.D.FL.) This greatly distinguishes Russ from Mrs. Noreus and supports a sentence of no more than 60 months.

Stanton Witherspoon plead guilty and was ultimately sentenced to time served. *United States v. Witherspoon*, No. 23-CR-60005-RSS (S.D.FL.). Stanton participated in nursing fraud schemes for a decade transitioning from MedLife (Pierre and Tanis) to Sienna (Eunide Sanon) and then to the Carleen schools. Stanton was only held accountable for a small fraction of his total gains from his 10-year fraud scheme, limiting the forfeiture amount to Sienna. By giving Stanton this additional benefit, Stanton did not pay (as forfeiture) the 10 million that he earned in tuition from fraudulently operating schools and NERC.

Initially, Stanton was sentenced to 41 months imprisonment. After close to a dozen motions extending his time to surrender to prison, the court granted the government's 5k based on his cooperation against Carleen and varied based on his substantial payment to the

---

[12] Letter of Otis Rankine (p.1)

court. Much like Stanton, Carleen will pay millions of dollars to the court. Sentencing him to 1 day in jail and Mrs. Noreus to 5 years (or the 20 years the government prefers) is an insurmountable disparity that is inconsistent with the directive of 3553(a)(6).

Lemuel Pierre, another nursing school owner, was sentenced to 34 months in prison. *United States v. Pierre*, No. 25-CR-60206-Damian (S.D.FL.) Mr. Pierre's forfeiture amount (and corresponding gain from his scheme) was more than $9 million. While Mr. Pierre did cooperate with the government, his conduct and relationship with Stanton Witherspoon and Tanis was continuous. Indeed, Pierre's participation in fraudulent nursing schemes dates back almost a decade to Medlife with Tanis.

Cleophat Tanis was sentenced to 41 months. *United States vs. Cleophat Tanis,* 25-CR-60212-DIMITROULEAS (S.D. Fla.). Unlike Carleen, Mr. Tanis had a prior felony conviction in the District of Columbia. Tanis, like Pierre, operated Medlife and recruited Stanton into the fraudulent nursing scheme when Stanton was a student at Medlife. And like Pierre and Stanton, Tanis' involvement in fraudulent nursing schemes was continuous dating back to 2015.

These men may have each cooperated and plead guilty early on but their conduct lasted years and spanned several schools. In addition, these men appear to have bribed a public official in violation of New Jersey and possibly federal criminal statutes. Sentencing Mrs. Noreus to 5 years, Tanis to 3.5 years, Pierre to 2.5 years, and Stanton to 1 day already presents a great disparity. But any sentence greater than 5 years would contravene the purpose of 3553(a)(6).

**C. Voluntary Multi-Million Dollar Payments (18 U.S.C. Section 3553(a)(7))**

Sentencing factor 3553(a)(7) supports a variance because of Carleen's voluntary payment of 4 million dollars. *See United States v. Kim,* 364 F.3d 1235 (11th Cir. 2004) (affirming a departure for extraordinary restitution efforts); *United States v. Broderson*, 67 F.3d 452, *1241 458-59 (2d Cir.1995) (affirming a district court's downward departure based in part on the defendant's restitution even though it could be justified "only as a `discouraged departure'" given that, "[o]rdinarily, payment of restitution is not an appropriate basis for downward departure under Section 5K2.0 because it is adequately taken into account by Guidelines Section 3E1.1"); *United States v. Lieberman*, 971 F.2d 989, 996 (3d Cir.1992) (affirming a district court's downward departure on the basis of the defendant's acceptance of responsibility as primarily demonstrated by his restitution); *United States v. Oligmueller*, 198 F.3d 669 (8th Cir. 1999) (departure affirmed for payment of 90% of restitution owed to victim); *United States v. Davis,* 797 F. Supp. 672 (D.C. N. Ind. 1992) (8- level downward departure proper where defendant paid $775,000 in restitution voluntarily, finding that the amount of "pre-paid restitution is a circumstance which is highly unusual, and is present in this case to a degree substantially in excess of that which ordinarily is involved in sentencing considerations for similar convictions.").

The cases of *United States v. Yara Suarez*, 17-CR-20453-FAM-2 (S.D. Fla) and *United States v. Jesus Suarez*, 17-CR-20453-FAM-1 (S.D. Fla.) are instructive. In those cases, Honorable Federico Moreno granted a downward variance of more than 50% from Mrs. Suarez' total adjusted offense level and a variance of more than a 65% downward variance from Mr. Suarez' offense level of 30 (97-121 months) based largely on an $830,000 payment towards restitution from the

sale of real properties owned by the couple. Here, by comparison, Mrs. Noreus has bankrupted herself to pay 4 million dollars towards the forfeiture judgment in this case.

Beyond this, no other nursing education fraud defendant – amongst the dozens of defendants who have been sentenced in this District -- has paid back 4 million dollars other than Stanton Witherspoon.

And so, Carleen's substantial payments support a downward variance.

**CONCLUSION**

Based on an application of the 3553(a) factors set forth herein, Carleen respectfully submits that this court sentence her to no more than 60 months.